**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| CENTRAL SOURCE LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:23cv586 (CMH/WEF) |
| | ) |
| ANNUALCREDITREPORT.COM, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff Central Source LLC's ("Plaintiff" or "Central Source") Motion for Default Judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 55(b)(2). (Dkt. 10). In this *in rem* action, Plaintiff seeks entry of default judgment against internet domain names, <annualcreditreport.com>, <annualcreditreportt.com>, <annyalcreditreport.com>, <20annualcreditreport.com>, and <qannualcreditreport.com>. (collectively, the "Defendant Domain Names" or "Defendants"). Pursuant to 28 U.S.C. § 636(b)(1)(C), the undersigned magistrate judge is filing with the Court these proposed findings of fact and recommendations, a copy of which will be provided to all interested parties. For the reasons set forth below, the undersigned recommends that Plaintiff's Motion for Default Judgment be granted and the relief sought be awarded.[1]

---

[1] Relevant filings before the Court include the Complaint (Dkt. 1) ("Compl."); Motion for Service by Publication (Dkt. 3); Memorandum in Support of Motion for Service by Publication (Dkt. 4); Declaration of Adrienne J. Kosak Regarding Motion for Service (Dkt. 4-1); Court's Order Granting Motion for Service by Publication (Dkt. 6); Declaration of Adrienne J. Kosak Regarding Court's Order on Motion for Service by Publication (Dkt. 7); Plaintiff's Request for Entry of Default (Dkt. 8); Declaration of Adrienne J. Kosak in Support of Request for Entry of Default (Dkt. 8-1); Clerk's Entry of Default (Dkt. 9); Plaintiff's Motion for Default Judgment (Dkt. 10)

**Procedural Background**

On May 2, 2023, Plaintiff filed this lawsuit *in rem* against the Defendant Domain Names alleging violations of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125 *et seq*.  (Dkt. 1, Compl.).  Central Source was created in 2004 to provide customers with a secure means to request and obtain a free credit report once every 12 months in accordance with the Fair and Accurate Credit Transactions Act.  (Compl. ¶ 17).  Plaintiff alleges that it has protectible rights in the ANNUALCREDITREPORT mark, which was publicly launched in 2004 and has since become widely known among relevant consumers.  (*Id*. ¶¶ 16, 21-24).  Additionally, Plaintiff alleges that it provides its services to consumers through a website at <www.AnnualCreditReport.com>, and AnnualCreditReport is the only service authorized by the U.S. Federal Trade Commission and the Consumer Financial Protection Bureau to provide this service.  (*Id*. ¶ 18).  Central Source registered the <AnnualCreditReport.com> domain name on June 25, 2004, and over the course of June and July of 2004, Central Source registered additional related domain names.  (*Id*. ¶¶ 19-20).  Indeed, Central Source alleges that it now owns more than 600 domain names representing typographical errors as a defensive measure intended to protect consumers by limiting cybersquatting of similarly related domain names to <AnnualCreditReport.com>.  (*Id*. ¶ 20).  In addition to its claimed common law trademark rights in the ANNUALCREDITREPORT mark, the Complaint further alleges that Plaintiff owns an incontestable federal trademark registration for the ANNUALCREDITREPORT mark (Reg. No. 4,152,650).  (Compl. ¶¶ 33-35; Compl., Exh. 6).  Plaintiff asserts that the Defendant Domain Names violate the ACPA because they are confusingly similar to Plaintiff's federally registered

---

("Mot. Default J."); Memorandum of Law in Support of Plaintiff's Motion for Default Judgment (Dkt. 11) ("Mem. Supp."); and all attachments and exhibits submitted with those filings.

ANNUALCREDITREPORT mark, and as a result, Plaintiff seeks an order requiring the registrars of the Defendant Domain Names be changed by the registries to Central Source's registrar of choice, and that the registrar then change the registrant(s) to Central Source. (Compl. ¶ 54; Compl. Prayer for Relief).

On May 17, 2023, Plaintiff filed its Motion for Service by Publication supported by a brief and a declaration of Plaintiff's counsel, Adrienne J. Kosak. (Dkts. 3-4). The undersigned granted Plaintiff's motion on May 19, 2023 and authorized service by publication in *The Washington Times* or *The Washington Post*. (Dkt. 6). The May 19, 2023 Order required Defendants to answer or otherwise respond to the Complaint within twenty-one (21) days from the date of publication. (*Id.*) The undersigned also required Plaintiff to serve a copy of the Order on the Defendants through the e-mail addresses and/or electronic portal the registrant(s) provided in the domain name registrations, if the registrant(s) have made such contact information publicly available. (*Id.*) On June 7, 2023, Plaintiff filed a declaration confirming that it had published the Order in *The Washington Times* on May 25, 2023. (Dkt. 7). The declaration also confirmed that on May 31, 2023, Plaintiff served a copy of the Order on the Defendants through the e-mail addresses identified in the domain name registrations. (*Id.*) Additionally, for those Defendant Domain Names that did not provide their email contact information, Plaintiff used the online portal identified in the domain name registrations to provide registrants with means of contacting Plaintiff's counsel to obtain a copy of the Order. (*Id.*) As a result, Defendants were required to answer or otherwise respond to the Complaint by June 15, 2023. No one on behalf of the Defendant Domain Names filed an answer or otherwise responded to the Complaint by June 15, 2023, or anytime thereafter.

On June 16, 2023, Plaintiff requested entry of default as to Defendants with an

3

accompanying declaration of Adrienne J. Kosak in support of its request.  (Dkt. 8).  The Clerk entered default as to the Defendant Domain Names on June 21, 2023.  (Dkt. 9).  On June 27, 2023, Plaintiff filed its Motion for Default Judgment as to Defendant Domain Names and an accompanying memorandum of law.  (Dkts. 10, 11).  Plaintiff noticed the Motion for Default Judgment for a hearing before the undersigned for July 28, 2023.  (Dkt. 12).  On July 28, 2023, counsel for Plaintiff appeared and presented argument in support of its motion, and no one appeared on behalf of the Defendant Domain Names.  (Dkt. 13).  In fact, to date, no party with an interest in the Defendant Domain Names has appeared or otherwise participated in these proceedings.

Finding the allegations in the Complaint to be uncontested, the undersigned took the matter under advisement to issue this Report and Recommendation.

## Facts Alleged in the Complaint and Deemed Admitted

Fed. R. Civ. P. 55 provides for the entry of a default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend."  Based on the failure of the Defendants to file an answer or other responsive pleading in a timely manner, the Clerk entered default as to each Defendant Domain Name.  (Dkt. 9).  A defendant in default admits the factual allegations in the complaint.  *See* Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied."); *see also JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 736 (E.D. Va. 2014) (stating that when a defendant has defaulted, the well-pleaded allegations of facts set forth in the plaintiff's complaint are deemed admitted) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)).

In this case, the following facts alleged in the Complaint are deemed admitted.  Plaintiff

Central Source is a corporation organized and existing under the laws of Delaware with a principal place of business in Atlanta, Georgia.  (Compl. ¶ 5).  Central Source was created in 2004 to provide consumers with a secure means to request and obtain a free credit report once every 12 months in accordance with the Fair and Accurate Credit Transaction Act.  (*Id*. ¶ 17).  Credit Source provides its services to consumers through its website at <www.AnnualCreditReport.com>.  (*Id*. ¶ 18).  AnnualCreditReport is the only service and website authorized by the U.S. Federal Trade Commission and the Consumer Financial Protection Bureau to provide this service.  (*Id*.)  Central Source registered the <AnnualCreditReport.com> domain name on June 25, 2004.  (*Id*. ¶ 19).  Throughout June and July of 2004, Central Source registered numerous related domain names and now owns more than 600 domain names representing typographical errors of AnnualCreditReport as a "defensive measure intended to protect consumers by limiting cybersquatting of domain name registrations related to AnnualCreditReport."  (*Id*. ¶ 20).

Central Source first began promoting the ANNUALCREDITREPORT mark and website in a press release issued on November 23, 2004.  (Compl. ¶ 21).  As a result of the press release, several major media organizations nationwide, including *The Chicago Tribune*, *The Kansas City Star*, *The New York Times*, *The Sacramento Bee*, *The San Francisco Chronical*, *The Star-Ledger*, *USA TODAY*, and *The Washington Post*, referenced the ANNUALCREDITREPORT mark and the <AnnualCreditReport.com> website.  (*Id*. ¶ 21).  The AnnualCreditReport service was launched for public use on November 30, 2004.  (*Id*. ¶ 23).  As a result of Central Source's promotion and corresponding media coverage of the ANNUALCREDITREPORT mark and <AnnualCreditReport.com> domain name, consumers immediately associate both the mark and website with Central Source.  (*Id*. ¶ 22).  Indeed, since opening for public use, AnnualCreditReport has received more than 700,000,000 visits to <AnnualCreditReport.com>.  (*Id*. ¶ 24).

In addition to Central Source's own promotion of its services, the U.S. Federal Trade Commission has engaged in a wide-ranging public service campaign, which promotes AnnualCreditReport through informational websites, television and Internet commercials, and audio public service announcements. (Compl. ¶ 25). The Federal Trade Commission has also previously pursued unauthorized Internet uses of AnnualCreditReport and typographical variations of AnnualCreditReport. (*Id*. ¶ 26). Additionally, the Credit Card Accountability Responsibility and Disclosure Act requires certain mandatory references to <AnnualCreditReport.com> whenever an advertisement or website offers a free credit report. (*Id*. ¶¶ 27-29). These mandatory disclosures required by law have resulted in millions of references to ANNUALCREDITREPORT and its services being presented to consumers. (*Id*. ¶ 30). Through the promotion and use of the ANNUALCREDITREPORT mark by Central Source, the Federal Trade Commission, and third parties who are statutorily required to identify AnnualCreditReport, the ANNUALCREDITREPORT mark has become famous, or at the very least distinctive, throughout the United States in connection with Central Source's services. (*Id*. ¶ 31). As a result of the wide-spread usage and promotion of the ANNUALCREDITREPORT mark, consumers have come to distinguish and recognize the legitimacy of Central Source's services, and thus, the ANNUALCREDITREPORT mark is entitled to common law trademark rights. (*Id*. ¶ 33). Further, Central Source owns an incontestable federal registration for the ANNUALCREDITREPORT mark (Reg No. 4,152,650), which is conclusive evidence of the validity of the mark, Central Source's ownership of the mark, and of Central Source's exclusive right to use the mark in U.S. commerce. (*Id*. ¶¶ 34-35).

Defendant domain name <annualcreditreport.com> is an Internet domain name that, through either the registrar or a privacy service, has entirely concealed the identity of its registrant.

(Compl. ¶ 6; Compl., Exh. 1).  Defendant domain name <annualcreditreporft.com> is an Internet domain name, which according to the WHOIS database[2], is registered to an unidentified person or entity located in An Hui, China.   (Compl. ¶ 7; Compl., Exh. 2).   The registrant of <annualcreditreporft.com> has similarly used a privacy service to conceal its identity.   (*Id.*) Defendant domain name <annyalcreditreport.com> is an Internet domain name, which according to the WHOIS database, is registered to an unidentified person or entity who has used the privacy service PrivacyProtection.com, LLC to conceal its identity.  (Compl. ¶ 8; Compl., Exh. 3). Defendant domain name <20annualcreditreport.com> is an Internet domain name, which according to the WHOIS database, is registered to an unidentified person or entity who has used a privacy service to conceal its identity.  (Compl. ¶ 9; Compl., Exh. 4).  Finally, Defendant domain name <qannualcreditreport.com> is an Internet domain name, which according to the WHOIS database, is registered to an unidentified person or entity who has used the privacy service Domains By Proxy, LLC to conceal its identity.  (Compl. ¶ 10; Compl., Exh. 5).  Together, the individual Defendant domain names are referred to as "the Defendant Domain Names."

        As previously noted, Central Source has engaged in significant efforts to protect consumers by registering domain names that represent typographical variations of ANNUALCREDITREPORT and by pursuing the disabling of domain names that are being used to confuse or mislead consumers.  (Compl. ¶ 36).   Central Source has also successfully pursued legal action to obtain the transfer to Central Source of domain names that infringe upon the

---

[2] WHOIS is a "domain lookup [that] allows you to trace the ownership and tenure of a domain name."  "The Whois database contains details such as the registration date of the domain name, when it expires, ownership and contact information, nameserver information of the domain, the registrar via which the domain was purchased, etc."  *See* https://www.whois.com/whois/.  In other words, it is an Internet domain "registry database."  *Alfieri-Crispin v. Li Ting*, No. 1:15cv608 (AJT/MSN), 2015 WL 5560000, at *3 (E.D. Va. Sept. 11, 2005).

ANNUALCREDITREPORT mark and were registered and/or used in bad faith.  (Compl. ¶¶ 4, 37).

Here, the Defendant Domain Names represent either typographical errors, known as "typosquatting," or incorporate the entire ANNUALCREDITREPORT mark in its domain name, which are confusingly similar to Central Source's distinctive and federally registered ANNUALCREDITREPORT mark.  (Compl. ¶¶ 4, 38).  "Typosquatting"—the registration or use of a domain name that represents a typographical error of a legitimate site—is typically used to display advertisements related to the legitimate site, to distribute computer viruses or "malware," or to collect visitors' personal information for inappropriate or illegal uses.  (*Id*. ¶ 2). Typosquatting harms consumers by causing confusion with the legitimate sites being sought by the consumer and often results in consumers' computers being infected with viruses or unwanted software, consumers' personal information being collected and misused, and/or consumers being presented with unwanted advertisements.  (*Id*. ¶ 3).

The typosquatting Defendant Domain Names were registered for the purpose of obtaining Internet visitors when such visitors make a typographical error on their keyboard when attempting to reach <AnnualCreditReport.com.>.  (Compl. ¶ 39).  Further, the Defendant Domain Names incorporation of the ANNUALCREDITREPORT mark was for the purpose of misleading consumers into believing that they were offering legitimate credit reporting services.  (*Id*. ¶ 40). None of the Defendant Domain Names route to a website that offers bona fide services and, in fact, some Defendant Domain Names direct to websites that include pay-per-click advertising.  (*Id*. ¶ 41).  The Defendant Domain Names do not and cannot reflect the legal name of the registrant(s) of the domain names, and the registrant(s) of the Defendant Domain Names have not engaged in bona fide noncommercial or fair use of the ANNUALCREDITREPORT mark in a website

accessible under the domain names.   (Compl. ¶¶ 44, 45).   Finally, the use of the ANNUALCREDITREPORT mark within the Defendant Domain Names is without authorization from Central Source, and the website displayed by the registrant(s) of the Defendant Domain Names are likely to be confused with Central Source's legitimate online location at <AnnualCreditReport.com> and actual consumer confusion is occurring in the marketplace.   (*Id.* ¶¶ 43, 46).

**Jurisdiction and Venue**

In this case, the Court must have both subject matter jurisdiction and *in rem* jurisdiction over the Defendant Domain Names, and venue in this judicial district must be proper before the Court can render a default judgment.

### Subject Matter Jurisdiction

Plaintiff brings this cause of action pursuant to the ACPA (15 U.S.C. § 1125 *et seq.*). Therefore, the undersigned recommends the Court find it has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the violations of the ACPA raise a federal question.   This Court also has subject matter jurisdiction pursuant to both 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121(a), which grant jurisdiction to federal district courts for civil actions arising under federal trademark law.

### In Rem Jurisdiction

In order to establish *in rem* jurisdiction, 15 U.S.C. § 1125(d)(2)(A) requires Plaintiff to show that the Defendant Domain Names violate Plaintiff's rights as the owner of the ANNUALCREDITREPORT mark, and Plaintiff is not able to obtain *in personam* jurisdiction over a person who would have been a defendant in a civil action or that despite its due diligence Plaintiff is unable to find a person who would have been a civil defendant in a civil action.  Specifically, 15 U.S.C. § 1125(d)(2)(A) provides, in pertinent part:

The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if –

> (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and

> (ii) the court finds that the owner –

>> (I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or

>> (II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by –

>>> (aa) sending notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

>>> (bb) publishing notice of the action as the court may direct promptly after filing the action.

As set forth in the Fed. R. Civ. P. 12(b)(6) analysis below, the facts alleged in the Complaint and deemed admitted for purposes of this motion, properly state a claim for cybersquatting in violation of the ACPA.  Therefore, the undersigned recommends the Court find the first statutory prong needed to establish *in rem* jurisdiction is satisfied.  *See* 15 U.S.C. § 1125(d)(2)(A)(i).

Next, the record clearly establishes that Plaintiff has also satisfied the second statutory prong needed to establish *in rem* jurisdiction.  *See* 15 U.S.C. § 1125(d)(2)(A)(ii).  As a threshold matter, the WHOIS database did not contain the identities of the registrants.  Therefore, the identity of the registrant(s) of the Defendant Domain Names are unidentified, unknown, or are concealed through a privacy service, such as PrivacyProtection.com, LLC or Domains By Proxy, LLC. (Compl. ¶¶ 6-10; Compl., Exhs. 1-5; Dkt. 4-1 ¶ 4).  As a result, Plaintiff was unable to obtain *in personam* jurisdiction over a person who would have been a defendant in this cybersquatting action.  Therefore, the undersigned recommends the Court find the second statutory prong needed

10

to establish *in rem* jurisdiction is satisfied.  *See* 15 U.S.C. § 1125(d)(2)(A)(ii)(I).

The second statutory prong needed to establish *in rem* jurisdiction is also satisfied if through due diligence Plaintiff was not able to find a person who would have been a defendant in a civil action by (1) sending notice of the alleged violation and intent to proceed to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar, and (2) publishing notice of the action as the court may direct promptly after filing the action.  *See* 15 U.S.C. § 1125(d)(2)(A)(ii)(II).   Here again, the record clearly establishes the individuals responsible for registering the Defendant Domain Names have successfully concealed their identities and location, leaving Plaintiff no reasonable opportunity to find them and bring them before the Court as a defendant in this civil action.

Moreover, on May 2, 2023, Plaintiff provided the current registrant(s) of the Defendant Domain Names with notice of the alleged allegations and Central Source's intent to proceed *in rem* under the ACPA, which included a copy of the Complaint.  (Dkt. 4; Dkt. 4-1 ¶ 6, Exh. A). Specifically, the notices were sent via the registrant(s) contact information listed on the WHOIS database for the Defendant Domain Names.  (*Id*.)  Where the available information provided no means to contact the registrant(s) directly, Plaintiff sent notice of alleged violations to the domain name registrar and/or privacy service listed in the WHOIS record for the Defendant Domain Names.  (*Id*.)  In addition to sending notice to the Defendant Domain Names through the physical and email addresses provided on the domain name registrations, Plaintiff also sent separate notices to any online contact portals listed in the WHOIS record.[3]  (Dkt. 4-1 ¶ 7, Exh. A).  Thus, Plaintiff

---

[3] Some of the Defendant Domain Names provided "online contact portals" listed in the WHOIS registration.  In instances where it was impossible to convey personalized messages, Plaintiff informed the recipient of Plaintiff's action and intent to proceed *in rem* and directed the recipient to contact counsel for a copy of the Complaint.  (Dkt. 4-1 ¶ 7).

complied with § 1125(d)(2)(A)(ii)(II)(aa).

Finally, § 1125(d)(2)(A)(ii)(II)(bb) requires an *in rem* plaintiff to provide notice of the proceeding by "publishing notice of the action as the court may direct promptly after filing the action." On May 17, 2023, Plaintiff filed a Motion for Service by Publication, which was granted by the Court on May 19, 2023. (Dkts. 3, 6). Plaintiff complied with the May 19, 2023 Order, causing the Order to be published in *The Washington Times* on May 25, 2023 and serving the Order on Defendant Domain Names via electronic means on May 31, 2023. (Dkt. 7; Mem. Supp. at 9).

Plaintiff need only satisfy either § 1125(d)(2)(A)(ii)(I) or § 1125(d)(2)(A)(ii)(II) to meet the second statutory prong required to establish *in rem* jurisdiction. Although 15 U.S.C. § 1125(d)(2)(A)(ii)(I) and § 1125(d)(2)(A)(ii)(II) provide independent grounds upon which *in rem* jurisdiction may be established, here the record clearly demonstrates that Plaintiff properly alleged facts that satisfy both prongs of § 1125(d)(2)(A)(ii). For these reasons, the undersigned recommends the Court find it has *in rem* jurisdiction over each of the Defendant Domain Names pursuant to 15 U.S.C. § 1125(d)(2)(A) and has fully complied with the Court's May 19, 2023 Order.

### *Venue*

Pursuant to 15 U.S.C. § 1125(d)(2)(C), for an *in rem* action, the domain name "shall be deemed to have its situs" in the judicial district where the "registrar, registry, or other domain name authority" is located. Here, Plaintiff properly alleges that the principal place of business of the .COM domain name registry, Verisign, Inc., is situated in this judicial district, and all the Defendant Domain Names are .COM domain names. (Compl. ¶ 15). Therefore, the undersigned recommends the Court find venue to be proper in this judicial district pursuant to 28 U.S.C. §

1391(b) and 15 U.S.C. § 1125(d)(2)(A).

## Joinder of Defendant Domain Names

Fed. R. Civ. P. 20(a)(2) permits joinder of persons as defendants when "any right to relief . . . aris[es] out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action." Here, Plaintiff asserts that joinder of the Defendant Domain Names is proper because each *in rem* cybersquatting claim arises out of the same series of transactions and involve common questions of law or fact. (Compl. ¶ 16; Mem. Supp. at 7-8). As Plaintiff correctly states, the Defendant Domain Names were all registered or re-registered in the same series of registration transactions—occurring in very close temporal proximity (all since 2022), using the same methods, and for the common purpose of cybersquatting on the ANNUALCREDITREPORT mark—to registrant(s) who intentionally concealed their identities with the intent to confuse visitors regarding an affiliation with the legitimate services offered by Central Source. (Compl. ¶¶ 6-10, 47; Compl., Exhs. 1-5; Dkt. No. 4-1 ¶¶ 4-5). These facts, when applied to the asserted claim under the ACPA, raise common questions regarding the confusing similarity to Central Source's distinctive mark and the common indicia of bad faith registration. *See PragmaticPlay Int'l Ltd. v. 789PragmaticPlay.com,* No. 1:22-cv-835 (CMH/JFA) [Dkt. No. 17] (E.D. Va. Dec. 9, 2022) (finding Rule 20 joinder appropriate where 163 defendant domain names shared common facts including registration in the same general time frame and use of the same methods of cybersquatting). For these reasons, and given the precedent of this District, the undersigned recommends the Court find the Defendant Domain Names are properly joined in a single Complaint pursuant to Fed. R. Civ. P. 20.

However, even if Rule 20 is not a proper basis to join *in rem* defendants in a cybersquatting action, the Defendant Domain Names are properly joined under Fed. R. Civ. P. 21. Rule 21 allows

courts to include parties in a single action "on just terms," which has been interpreted within this District to include maintaining ACPA actions against multiple domain names presenting similar questions of fact and law.  *See Coach, Inc. v. 1941 Coachoutletstore.com,* No. 1:11CV309 (JCC/JFA), 2012 WL 27918, at *4 (E.D. Va. Jan. 5, 2012); *see also Lendingclub Bank, Nat'l. Assoc. v. LenddingClub.com,* 1:22-cv-484 (AJT/JFA) [Dkt. No. 23] (E.D. Va. Feb. 27, 2023) (finding joinder appropriate under Rule 21 where the plaintiff failed to support joinder under Rule 20); *789PragmaticPlay.com,* No. 1:22-cv-835 (CMH/JFA) [Dkt. No. 17] (finding, in the alternative to application of Rule 20, that the court should disregard any defects in joinder of 163 domain names because none of the defendants had been prejudiced by the joinder).  In similar situations, this District has consistently allowed joinder of domains as defendants.  *See, e.g., Coach,* 2012 WL 27918 (maintaining a single cybersquatting action against 356 domain names); *Cent. Source LLC v. Aannualcreditreports.com,* No. 1:21-cv-1439 (LMB/TCB), 2022 WL 3337805, at *1 (E.D. Va. Apr. 21, 2022) (recommending entry of default judgment against eighty-four domain names cybersquatting the same mark); *Cent. Source LLC v. Ann. 1 creditreport.com,* No. 1:17-cv-581 (AJT/IDD), 2018 WL 2770194, at *1 (E.D. Va. June 8, 2018) (granting default judgment against 102 domain names cybersquatting the same mark).  In this case, each Defendant Domain Name presents similar questions of law and fact and as a result their joinder in a single Complaint is "on just terms."  Therefore, the undersigned also recommends the Court find the Defendant Domain Names are properly joined pursuant to Fed. R. Civ. P. 21.

### Service of Process

Fed. R. Civ. P. 4(n)(1) states that "[t]he court may assert jurisdiction over property if authorized by a federal statute" and notice to claimants of the property is given as provided in the statute.  The ACPA explicitly authorizes service of process for *in rem* actions.   Specifically, 15

U.S.C. § 1125(d)(2)(B) provides that the "actions under subparagraph (A)(ii) shall constitute service of process."   Subparagraph (A)(ii) requires the Plaintiff to satisfy either of the two following conditions:

> (I) [Plaintiff] is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or

> (II) through due diligence [Plaintiff] was not able to find a person who would have been a defendant in a civil action under paragraph (1) by –

>> (aa) sending notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

>> (bb) publishing notice of the action as the court may direct promptly after filing the action.

Satisfying one of these two conditions is also necessary to establish *in rem* jurisdiction under the ACPA.  When addressing *in rem* jurisdiction above, the undersigned applied the properly pled facts in the record to the statutory requirements and recommended the Court find Plaintiff satisfied both provisions of subparagraph (A)(ii).

As previously noted, Plaintiff provided the current registrant(s) of the Defendant Domain Names with notice of the alleged allegations and Central Source's intent to proceed *in rem* under the ACPA, which included a copy of the Complaint, on May 2, 2023.  (Dkt. 4; Dkt. 4-1 ¶ 6, Exh. A).   The notices were sent through the contact information available from the registration information on the WHOIS database for the Defendant Domain Names.  (*Id*.)  Where the available information provided no means to contact the registrant(s) directly, Plaintiff sent the notice of alleged violations to the domain name registrar and/or privacy service listed in the WHOIS record for the Defendant Domain Names.  (*Id*.)  In addition to sending notice to the Defendant Domain Names through the physical and email addresses provided, Plaintiff also sent separate notices to

any online contact portals listed in the WHOIS record. (Dkt. 4-1 ¶ 7, Exh. A).  Thereafter, Plaintiff fulfilled the final statutory requirement by "publishing notice of the action as the court" ordered on May 19, 2023 pursuant to 15 U.S.C. § 1125(d)(2)(A)(ii)(II)(bb).  (Dkt. 6).  Therefore, for the same reasons the undersigned recommended the Court find Plaintiff established *in rem* jurisdiction, the undersigned also recommends the Court find that Plaintiff properly effected service of process on the Defendant Domain Names.

### Fed. R. Civ. P. 12(b)(6) Analysis of Plaintiff's Cybersquatting Claim

Before entering default judgment, the Court must evaluate the plaintiff's complaint against the standards of Fed. R. Civ. P. 12(b)(6) to ensure that the complaint properly states a claim. *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003).

Plaintiff has brought a single cause of action for cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d).  (Compl. ¶ 1, 52-58).  The ACPA allows the owner of a mark to file an *in rem* action against a domain name if the domain name violates "any right of the owner of a mark." *See* 15 U.S.C. § 1125(d)(2)(A).  This encompasses rights against cybersquatting provided for under § 1125(d)(1).  *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 228, 232 (4th Cir. 2002).  Therefore, the owner of a mark can be entitled to *in rem* relief upon proving a violation of § 1125(d)(1).

Section 1125(d)(1) creates civil liability for registering, trafficking in, or using a domain name that is "identical or confusingly similar" to a plaintiff's mark, with a "bad faith intent to profit from that mark."  15 U.S.C. § 1125(d)(1)(A).  Thus, to sufficiently plead an ACPA cause of action, a plaintiff must allege: (1) the plaintiff's ownership of a valid and protectable mark; (2) the plaintiff's mark is distinctive; (3) the registrant's use of a domain name that is "identical or confusingly similar" to the plaintiff's mark; and (4) the registrant's bad faith intent to profit from

16

the mark or domain name.  *See id.*

### 1. *Plaintiff Possesses a Valid and Protectable Mark*

The undersigned recommends the Court find that Plaintiff has sufficiently demonstrated protectable rights in the ANNUALCREDITREPORT trademark under common law and because the mark is registered with the USPTO.   First, Plaintiff owns an incontestable trademark registration in the United States for the ANNUALCREDITREPORT trademark (Reg. No. 4,152,650).  (Compl. ¶ 34; Compl., Exh. 6).  Ownership of this registration entitles Central Source to a statutory presumption of exclusivity in the mark.  *See* 15 U.S.C. § 1057(b).  In addition to its statutory rights, Plaintiff is also entitled to common law trademark rights in the ANNUALCREDITREPORT mark.  *See Emergency One, Inc. v. Am. Fire Eagle Engine Co*., 332 F.3d 264, 267 (4th Cir. 2003) ("At common law, trademark ownership is acquired by actual use of the mark in a given market.").   Plaintiff first began using and promoting the ANNUALCREDITREPORT mark in 2004 and registered the domain name <AnnualCreditReport.com> on June 25, 2004, which provides customers with a means of requesting and obtaining free credit reports.  (Compl. ¶¶ 17, 18, 19, 21, 23).  Through widespread promotion and publicity of the ANNUALCREDITREPORT mark and corresponding services by both Plaintiff and the U.S. Federal Trade Commission, the ANNUALCREDITREPORT mark has become distinctive and well-known throughout the United States.   (*Id*. ¶¶ 21-22, 25, 31).  Therefore, Plaintiff possesses valid and protectable rights in the ANNUALCREDITREPORT mark and is entitled to enforce the provisions of Section 1125(d) against any domain name that violates those rights.

### 2. *Plaintiff's ANNUALCREDITREPORT Mark is Distinctive*

The undersigned recommends the Court find that Plaintiff's ANNUALCREDITREPORT

mark is distinctive, as required under the statute.  15 U.S.C. § 1125(d)(1)(A)(ii); *see also People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367 (4th Cir. 2001).  Trademarks may be considered "fanciful," "arbitrary," or "suggestive," which are all inherently "distinctive." *Venetian Casino Resort v. Venetiangold.Com*, 380 F. Supp. 2d 737, 742 (E.D. Va. July 28, 2005) (citing *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996)).  They may also be considered merely "descriptive," which is not inherently distinctive, but is distinctive if the mark acquires "secondary meaning," *i.e.*, "if in fact a substantial number of present or prospective customers understand the designation" to refer to a particular business enterprise.  *Id.* (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)).  Registration of a trademark with the United States Patent and Trademark Office ("USPTO") serves as *prima facie* evidence that a mark has acquired distinctiveness.  *See Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 816 (4th Cir. 2001).  Such registered marks therefore "begin[] with the presumption that [they], at a minimum, are 'descriptive and have secondary meaning.'"  *See Venetian Casino Resort*, 380 F. Supp. 2d at 742.

Here, Plaintiff has an incontestable trademark registration from the USPTO for the trademark ANNUALCREDITREPORT.  (Compl. ¶ 34; Compl., Exh. 6).  Thus, the undersigned presumes Plaintiff's ANNUALCREDITREPORT trademark is, at the very least, descriptive and has obtained secondary meaning.  *See Venetian Casino Resort*, 380 F. Supp. 2d at 742.  Indeed, Plaintiff's factual allegations—now deemed admitted—establish that since its initial launch of the ANNUALCREDITREPORT mark in 2004, and as a result of Plaintiff's extensive promotion of the ANNUALCREDITREPORT mark and corresponding promotion of the mark through the Federal Trade Commission and media organizations nationwide, consumers have come to immediately recognize the legitimacy of Central Source's services.  (Compl. ¶¶ 21-25, 31, 33).

Moreover, continuous use of a domain name in the promotion of a business and services is sufficient to establish common law rights in a trademark. (*See* Mem. Supp. at 12). Here, Central Source has used the ANNUALCREDITREPORT mark as part of its <AnnualCreditReport.com> domain name since 2004 and has received more than 700,000,000 visits since the website was first opened for public use. (Compl. ¶¶ 18-19, 24). These facts further strengthen the presumption that the ANNUALCREDITREPORT mark has obtained secondary meaning, and no facts rebutting the presumption are before the Court. Taking into account both Central Source's incontestable trademark registration and continuous common law use of the ANNUALCREDITREPORT trademark, the Court recommends a finding that the ANNUALCREDITREPORT is distinctive.

### 3. *Defendant Domain Names are Confusingly Similar to Plaintiff's Mark*

The undersigned recommends the Court find that the Defendant Domain Names are confusingly similar to Plaintiff's ANNUALCREDITREPORT trademark. *See* 15 U.S.C. § 1125(d)(1)(A)(ii); *see also People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367 (4th Cir. 2001).

The infringing domain name does not need to be identical to the registered mark, only confusingly similar. *See* 15 U.S.C. § 1125(d)(1)(A)(ii)(I); *see also Volvo Trademark Holding AB v. Volvospares.com*, 703 F. Supp. 2d 563, 568 (E.D. Va. 2010). The confusing similarity standard is satisfied where a domain name is similar to a protected mark such that a "reasonable consumer 'might think they were used, approved, or permitted by [the plaintiff].'" *Venetian Casino Resort*, 380 F. Supp. 2d at 743 (quoting *Harrods, Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 677 (E.D. Va. June 27, 2001), *rev'd on other grounds*, 302 F.3d 214 (4th Cir. 2002)). Stated differently, a confusingly similar domain name and mark are "so similar in sight, sound and meaning that they could be confused." *Id.* (internal quotations and citation omitted).

Here, the Defendant Domain Names, <annualcredit**d**report.com>, <annualcreditrepor**ft**.com>, <ann**y**alcreditreport.com>, <**20**annualcreditreport.com>, and <**q**annualcreditreport.com> fully incorporate and duplicate, or intentionally misspell, Plaintiff's ANNUALCREDITREPORT trademark.   Moreover, Plaintiff operates the domain name <AnnualCreditReport.com> that similarly incorporates the ANNUALCREDITREPORT trademark, and is nearly identical to the Defendant Domain Names, apart from additional letters or numbers (e.g., "d," "f," "y," "20," or "q") randomly appearing in the typosquatting domain names.   (*See* Compl. ¶¶ 6-10, 18).   The construction of the typosquatting Defendant Domain Names was clearly intended to confuse customers, and their similarity in sight and meaning could reasonably do so.   (Compl. ¶¶ 4, 54; Mem. Supp. at 13-14).   Plaintiff has alleged sufficient facts to satisfy the "confusing similarity" requirement of the ACPA.   *See Agri-Supply Company, Inc. v. Agrisupply.Com*, 457 F. Supp. 2d 660, 663 (E.D. Va. Sept. 13, 2006) (holding the domain name was confusingly similar because it was "virtually identical" to Plaintiff's trademark); *Fox News Network, LLC v. xofnews.com*, No. 1:20-cv-00149, 2021 WL 5042995, at *5 (E.D. Va. Apr. 6, 2021) (finding that typosquatting "satisfies the confusingly similar requirement").

### 4.  *Registrants Have Acted with a Bad Faith Intent to Profit from Plaintiff's Mark*

Finally, the undersigned recommends that the Court find Plaintiff has demonstrated the registrant(s) bad faith intent to profit from Plaintiff's ANNUALCREDITREPORT trademark. Under the ACPA, bad faith intent may be considered by weighing nine factors:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

20

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i). The factors are given to courts as a guide and need not be exhaustively considered in every case. *Lamparello v. Falwell*, 420 F.3d 309, 319-20 (4th Cir. 2005). Indeed, "the most important grounds for finding bad faith 'are the unique circumstances of th[e] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute.'" *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 268 (4th Cir.2001) (quoting *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 499 (2d Cir. 2000)).

Factors I through IV overwhelmingly support Plaintiff's allegation of a bad faith intent to profit from use of the ANNUALCREDITREPORT trademark. First, the registrants of the Defendant Domain Names have no intellectual property rights in the Defendant Domain Names,

or any portion of the Defendant Domain Names, and instead use Plaintiff's rights without authorization.  (Compl. ¶¶ 32, 42-43; Mem. Supp. at 14).  The Defendant Domain Names also do not incorporate or consist of the legal name of "the person" nor have any of the Defendant Domain Names been previously used in connection with the bona fide offering of any goods or services. (Compl. ¶¶ 41, 44, 45; Mem. Supp. at 14).  Moreover, there is no evidence before the Court to suggest that the registrants engaged in bona fide noncommercial or fair use of the mark in a site accessible under the domain name.  (Compl. ¶ 45).  Quite the opposite, all reasonable inferences to be drawn from the properly alleged facts suggest that the registrants acted with a nefarious intent to profit by deceiving Plaintiff's customers.

Additionally, the undersigned recommends the Court find factor V supports Plaintiff's allegation of bad faith.  The registrants have duplicated and fully incorporated Plaintiff's distinctive mark into the Defendant Domain Names without authorization or permission.  Plaintiff owns a nearly identical domain name that similarly incorporates its ANNUALCREDITREPORT mark.  Indeed, the Defendant Domain Names subtle addition of randomly placed letters or numbers is clearly a premeditated effort to take advantage of a customer's innocent typographical mistake in order to unlawfully divert consumers from Plaintiff's legitimate online location.  (Compl. ¶ 39-40; 47).  The Defendant Domain Names are nearly identical to Plaintiff's own domain name and these typosquatting domain names would likely harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or enforcement of the site.  (*Id.*)

The undersigned recommends the Court find factor VII also supports Plaintiff's allegation of bad faith.  The Defendant Domain Names were registered anonymously, and the registrants purposefully concealed their identifying contact information using the "privacy service" of the

registrar.  (*See* Compl. ¶¶ 6-10; Mem. Supp. at 15).  The registrant(s) did not provide legitimate contact information on its domain name registration to reflect an actual person or entity, and instead, only provided email addresses via a privacy service or an online portal to contact the registrant(s).  (Dkt. 4-1 ¶¶ 4-7); *Montblanc-Simplo GmbH v. AChatStyloMontblanc.com*, No. 1:13-CV-1013, 2014 WL 107395, at *6 (E.D. Va. Jan. 3, 2014) (finding bad faith where true identity and correct service address have not been provided).  Under the facts of this case, such an effort to conceal the identities of those who created and operated the Defendant Domain Names is a clear sign of their bad faith intent.

Finally, the undersigned recommends the Court find that factor IX supports Plaintiff's allegation of bad faith.  As addressed above, the ANNUALCREDITREPORT trademark is at the very least distinctive, if not famous, throughout the United States in connection with Plaintiff's services.  The unauthorized colorable imitations of the ANNUALCREDITREPORT mark within the Defendant Domain Names indicate that the registrants were aware of the mark's distinctiveness prior to the registration of the typosquatting Defendant Domain Names.  (Compl. ¶¶ 31-32, 53).

Considering the factors with respect to the allegations in the Complaint, Plaintiff has sufficiently established a "bad faith intent to profit" from Defendants' use of Plaintiff's ANNUALCREDITREPORT mark.  *See Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d at 268 (noting the bad faith analysis depends upon "unique circumstances" of each case).

**Requested Relief**

The undersigned having recommended granting Plaintiff's Motion for Default Judgment under the ACPA, now turns to Plaintiff's request to transfer ownership and control of the Defendant Domain Names to Plaintiff.  (Compl. Prayer for Relief; Mem. Supp. at 15-16).

Pursuant to 15 U.S.C. § 1125(d)(1)(C), "[i]n any civil action involving the registration,

trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." Indeed, § 1125(d)(2)(D) limits the remedy for any cause of action brought *in rem* to "a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." Plaintiff, having established a violation of the ACPA in this *in rem* action, is entitled to its requested relief of transfer of the Defendant Domain Names to Plaintiff, as permitted by 15 U.S.C. §§ 1125(d)(1)(C), (2)(D). *See Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 490 (E.D. Va. 2002).

## Recommendation

For the reasons outlined above, the undersigned United States magistrate judge recommends the Court grant default judgment against the Defendant Domain Names with respect to Plaintiff's claim for violations of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and therefore grant Plaintiff relief in the form of an order stating that Verisign, Inc., the operator of the .COM registry, shall change the registrar(s) of record for the Defendant Domain Names to Plaintiff's domain name registrar of choice, GoDaddy.com, LLC, and that GoDaddy.com, LLC shall take all necessary steps to have Plaintiff Central Source LLC listed as the registrant(s) for the Defendant Domain Names.

## Notice

Plaintiff is directed to e-mail a copy of this Report and Recommendation to the registrar(s) and/or the listed privacy service of the Defendant Domain Names and to the Defendants at the e-mail addresses the registrants provided to the registrar, if available. Plaintiff is further directed to file a declaration certifying e-mail service of this Report and Recommendation on the registrar and the Defendants via the Court's electronic filing system. The parties are advised that objections to

this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service.  Failure to file timely objections waives appellate review of any judgment or decision based on this Report and Recommendation.


_William C. Fitzpatrick_
WILLIAM E. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

January 30, 2024
Alexandria, Virginia